**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**Gero Meyersiek,**
**Petitioner**

**Docket No. 05-398ML**

**v.**

**United States Citizenship and Immigration Services,**
**and Denis Riordan as District Director, Boston District,**
**U.S. Citizenship and Immigration Services,**
**Respondent**

# PETITIONER'S POST-HEARING MEMORANDUM

## I. Chronology of Relevant Evidence to Factual Issue of Alleged Insurance Fraud

| | |
|---|---|
| 2/1/2001 | Harvard Physician Dr. Eliot Berson exam of Dr. Meyersiek |
| 2/12/2001 | Examination by Dr. Michael O'Brien, M.D. confirming legal blindness of Dr. Meyersiek from testing done by Dr. Berson |
| 3/5/2001 | Communication of results of testing by Dr. Berson to Dr. Meyersiek that he is legally blind |
| 3/30/2001 | Letter reporting Dr. Berson's testing of severe constriction of visual fields resulting in legal blindness |
| 6/4/01 | Dr. Meyerseik's last day of work at Textron |
| 8/22/01 | Unum Disability application signed by Textron Manager/Benefit Programs |

## II. Dr. Meyersiek Did Not Commit Fraud

Fraud requires three elements: (1) the claimant must have knowingly and willfully made a false statement; (2) the statement must have been made in order to obtain an insurance benefit; and (3) the statement must have related to a material fact. See, e.g., U.S. v. Tupone, No. 04-2832 (3rd Cir. 03/28/2006). R. I. Gen. Laws § 11-41-29 similarly requires "intent to deceive" and "false information material to the claim."

**Initial Application for Benefits**

First, Dr. Meyersiek presented no statements at all to Unum in the initial application for disability benefits. Textron submitted the application, as called for by the disability policy, which

states "[t]he employer provides us with the information we need to administer this insurance contract . . ." (Def's Ex. B, Tab 2, § 8). The application contained medical information demonstrating that Dr. Meyersiek had advanced retinitis pigmentosa in both eyes with a field of vision of "less than 10 degrees in the center of each eye[,]" rendering him "legally blind."

The only statements that Dr. Meyersiek made to Unum do not contain information "material to the claim", nor did Dr. Meyersiek intend to deceive Unum.

**Dr. Meyersiek's Visual Deficits**

At the hearing on the merits before this Court, Dr. Helene Bradley explained what Dr. Meyersiek could see at the time he saw Dr. Berson in February of 2001: "If you hold a fist to your eye and just slightly open it and look through, that's what he would see [--] straight ahead and nothing to the side at all." (Hr'g Tr. at 86, July 13, 2006). She also explained what it meant in the report by his dark adaptation threshold being slightly elevated. "For us it would be [like] going into a dark movie theater. It takes us a certain amount of time to adjust to the light in a movie theater. For him, it would probably be 10 times, 15, 20 times longer than it would take us with a normal retina, pupil, to adjust to the light." (Hr'g Tr. at 87, July 13, 2006.) Sophia Meyersiek further delineated the difficulty Mr. Meyersiek had when he encountered decreased lighting, "It is just even going from this setting [the courtroom] to slightly darkened light. It takes a tremendous amount of time to adjust." (Hr'g Tr. at 92, July 13, 2006.)

**Dr. Meyersiek's Ability to Perform Essential Duties at Textron**

Dr. Meyersiek's position with Textron was Vice President, Strategy and International. His disability policy provided benefits to him if he could not perform, "with or without reasonable accommodation, the important duties of his own occupation. (Def Ex. B, Tab 2 Section 1, PD61000.1). His job description was included with Textron's application for Dr. Meyersiek's disability benefits. (Def.'s Ex. C at 75 - 77.) It included, most significantly, "Comfort around Top Management – Can deal comfortably with senior management (CEO/COO/CFO/Board of

Directors) without undue tension and nervousness . . . ." (Def's Ex. C at 77.) His position also involved "extensive domestic and international travel." (Def's Ex. C at 75.) Of course, extensive reading, writing and analyzing reports was an essential element of his key responsibilities as outlined in the document as well. (Def's Ex. C at 75.) As Dr. Bradley testified, "Reading like I said before, would be very difficult from losing his place, even on a computer with large print." (Hr'g Tr. at 80, July 13, 2006.)

Dr. Meyersiek testified that "it became very, very difficult for [him] to operate in the evening at social functions and so on[.]" and that operating in the evening was part of his duties. (Hr'g Tr. at 20, July 13, 2006.) He stated that he had difficulties with other activities, such as getting around in airports or conducting social functions. He managed by "memoriz[ing] everything that was going on . . . [,] memorize counters and hallways and so on. . . . [He] left [him]self plenty of extra time, but [he] still ran into things quite often." (Hr'g Tr. at 21, July 13, 2006.)

He further testified that [i]n business settings, in negotiations, [he] would very carefully pick the seat that offered [him] the widest angle of vision, . . . not looking into the light but looking away from the light because [him] eyes [we]re very sensitive . . . [and that he] was able to do that reasonably well for a while." (Hr'g Tr. at 22, July 13, 2006.)

When Dr. Meyersiek realized that he was legally blind, after visiting Boston eye and Ear at the Harvard Medical School early in 2001, he testified that "[i]t almost came as a relief . . . . [b]ecause it was getting to be impossible to do this work." Dr. Meyersiek was diagnosed with retinitis pigmentosa when he was 19. He described it as "an inherited illness that leads to the gradual deterioration of your retina starting from the periphery and ending up in total blindness. It is progressive, it's irreversible and it's incurable." In spite of this obstacle, Dr. Meyersiek reached the pinnacle of success, both academically and in the business world. However, one by one, his activities came to an end: driving, (Hr'g Tr. at 17, July 13, 2006), working as a top executive with a Fortune

500 company, traveling without assistance (Hr'g Tr. at 28, July 13, 2006), functioning in crowds (Hr'g Tr. at 33, July 13, 2006), and living on his own.

The Government's position is that because Dr. Meyersiek could and did travel for pleasure, then he could indeed perform as a top level executive. Being able to travel with family and friends does not equate to being able to function on a strict time schedule, constantly entering into new physical surroundings in top mental form, ready to negotiate contracts to transact multimillion dollar purchases. This is a ludicrous thought in light of Dr. Bradley's testimony.

Whether Dr. Meyersiek has "good moral character" boils down to statements he made on a questionnaire submitted to Unum on August 18, 2002 (Ex. C at 108) and in response to interviews from Unum personnel made in March of 2002. When asked to "[d]escribe how time is occupied and outline what activities you engage in at present." (Emphasis added.) He responded, "at home, no activities beyond home (almost complete blindness) and when responding to when he expects to return to work, he responded, "not expecting to return." First of all, the question is ambiguous with regard to the timeframe, "at present." ("at present" that day, that week, that month, that year?). Notwithstanding that issue, both statements were accurate in the framework of his being able to perform a job as Vice President, Strategy and International. Moreover, the statement was not material, in any context, to whether he was disabled with regard to the same-occupation policy Textron had with Unum. It does not constitute fraud.

Dr. Meyersiek's statements to Unum (Def. Ex. B, Tab 5) in which he told the Unum Case Management Nurse that he did not "want to flip hamburgers" and that fulfill his duties as an executive also do not evidence "false information material to the claim." Put in context, Dr. Meyersiek's statements were accurate and do not demonstrate any fraud or fraudulent intent.

## III. Dr. Meyersiek Has Met His Burden of Proving Good Moral Character

### A. Definition: "Good Moral Character"

The elements of "good moral character" are contained in 8 CFR 316.10. Under 8 CFR 316.10(a)(1), "[a]n applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character." Subsection (2) provides the only hint of a definition, as it states that "claims of good moral character" shall be made on a "case-by-case basis taking into account the elements enumerated in this section and the standards of the average citizen in the community of residence."

The Government bases its contention that Dr. Meyersiek lacks good moral character on allegations made by Unum Provident that Dr. Meyersiek committed fraud in obtaining disability insurance benefits. However, the Government has chosen to partner with a company that has demonstrated such obvious bad faith towards its insureds' claims that an independent body must now review Unum's denial of claims in every state in the union, as evidenced by the consent order of which this court took judicial notice.

Specific evidence of Unum's bad faith is relevant to show how little weight this Court should give the UnumProvident files admitted in Exhibit B. First, despite two subpoenas from the Government, Unum has NOT provided its complete file regarding Dr. Meyersiek and an inference of spoliation of evidence should be drawn from this refusal. Most obvious is the failure to provide complete hearing transcripts from Dr. Meyersiek's Family Court hearings.

Secondly, the "Summary" provided by Unum to the USCIS is replete with half truths and innuendo. In a letter dated January 26, 2005 Unum persuades USCIS to accept a "Summary of Facts" instead of the subpoenaed Special Investigation Unit Case Referral Binder. (Def. Ex. B, Tab Summary) At first blush, and without reading any of the "supporting" documentation, this summary is a devastating blow to Petitioner's claim. However, a review of all of the records provided by Unum tells a different story, and not one on which Unum could plausibly deny Dr. Meyersiek benefits. For example, Unum's investigators spoke with Mr. George Metzger, the Vice President of Human Resources at Textron, and the Unum investigator documents that Metzger

reported that Dr. Meyersiek requested an application for disability in May of 2001 and that Dr. Meyersiek's actual last day of work was, in fact, June 4, 2001. (Def. Ex. B, Tab 12.) Neither of these facts is contained in the Unum Summary. Unum also interviewed Mary Howell, Dr. Meyersiek's immediate superior at Textron. (Def. Ex. Tab 14.) Ms. Howell disclosed that Dr. Meyersiek told her "that travel was getting to him"; that he did not drive; that he would take someone's arm in a dark place, and that she believed he restricted his personal travel because of his disease. Ms. Howell also stated that she "had not been contacted by anyone thinking of hiring Meyersiek to date [July 7, 2003]." Again, none of this information, which would tend to confirm Dr. Meyersiek's disability, was contained in the Unum Summary.

The circumstances of the fraud allegations of Unum do not rise, in any shape or form, to the factual circumstances of the Government's cited cases where good moral character was not found. There has been no fraud found in the present case, and, significantly, no charges have ever been filed, as they were in Hirschberg v. Commodity Futures Trading Comm'n, 414 F.3d 679 (7th Cir. 2005), Peterson v. Kavanagh, 799 N.Y.S. 2d 640 (App. Div 2005); In re Bright, 860 So.2d 1104 (La. 2003), and Oltman v. Maryland State Bd. of Physicians, 875 A.2d 200, 217 (Md. App. 2005).

In addition, in the Government's cited case of In re: Monaco, 856 P.2d 311 (Or. 1993), the Board of Bar Examiners found as a fact that the applicant "was not candid and forthcoming in his testimony"; further, the applicant was found to have "knowingly misrepresented matters to the insurance company in connection with his claim (claiming to have receipts he did not have, presenting photocopies of items of questionable origin, not disclosing material facts, and other actions)." Id. at 313. These facts are distinguishable on several levels: Dr. Meyersiek's testimony was completely candid and forthcoming, and he did not manufacture evidence to support his claim. All medical evidence supports Dr. Meyersiek's disability claim. Also, arguably, admission to a Bar is a higher privilege than becoming a citizen of the United States; a large part of the populace of U.S. Citizens could not accomplish the moral standard of Bar admission. Certain statutory exclusions for

naturalization found in 8 C.F.R. § 316.10(b) would infer that, for instance, although one could have committed one crime for which the applicant was convicted and received a sentence of five years or more and still be naturalized, that conviction would probably preclude Bar admission.

**III. Standard of Proof**

The standard of proof applicable to the present case is found in Tutun v. United States, 270 U.S. 568:

> The applicant for citizenship, like other suitors who institute proceedings in a court of justice to secure the determination of an asserted right, must allege in his petition the fulfillment of all conditions upon the existence of which the alleged right is made dependent, and he must establish these allegations by competent evidence to the satisfaction of the court.

Id. (Emphasis added.) It follows, then, that the standard of proof is as with other civil cases, the preponderance standard.

The Government asserts that "any doubts must be resolved in favor of the Government." However, these doubts must be reasonable doubts. If they were not reasonable, then no one would be able to qualify, because it would be impossible for a human being to achieve.

Only four cases from the Supreme Court and one from the Circuit courts use that language. The original text in its entirety is as follows: "Citizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." (Emphasis added.) U.S. v. Manzi, 276 U.S. 463 (1928)(emphasis added)(quoting Swan & Finch Co. v. United States, 190 U.S. 143). That is a reasonable standard: "doubts" is plural, the Court used the word "should", not "must", and it stated "generally". This is not a super-human standard.

The language should also be viewed in the context of the five cases. In Manzi, id. at 463, the wife of a deceased man sought citizenship, based on her husband's declaration of citizenship, after the statutory period. The Court held that the wife must be held to the same statutory restrictions as the husband. In U.S. v. Schwimmer, 279 U.S. 644 (1929), the Court upheld the decision denying

citizenship to a woman pacifist who refused to agree to bear arms if called. Likewise, in U.S. v. Macintosh, 283 U.S. 605 (1931), the respondent applying for naturalization refused to promise in advance to bear arms for the United States unless he believed the war to be morally justified, and the Court upheld the denial of the petition. In Berenyi, the claimant had denied under oath that he had been a member of the communist party, but the attorney general produced two witnesses who gave details of his involvement in the communist party in Hungary. The court found that he had given false testimony in order to procure the benefit of naturalization. None of these cases are equivocal in the least to the petitioner's qualifications for citizenship, especially in comparison to the case at bar.

The only circuit case, Bagot v. Ashcroft, No. 04-2127 (3rd Cir. 2/11/2005), was a case in which the court upheld the citizenship claim of the petitioner. The court was confronted with complicated issues of legal custody for derivative naturalization purposes which involved conflicts between state and federal law. The court held that the petitioner for habeas corpus in a deportation case had actually gained U.S. citizenship derivatively through his father, who had "legal custody" of him when the father naturalized, and, as such, he could not be deported. Although the court quoted Macintosh, it did resolve the "doubts" of eligibility in favor of the claimant.

## IV. Evidence of Good Moral Character Produced at Trial

1. Sophia Meyersiek testified that the Petitioner has been a good father to their children, kept the marriage together for the sake of the children for many years, and has always supported her and the children.
2. Helene Bradley, Optometrist. She testified that the Petitioner is legally blind necessitating an impaired lifestyle and supports the petitioner's claim of disability.
3. Affidavits Supporting Good Moral Character

## V. Conclusion

Under the INA, the Court may look at the petitioner's history beyond the five years prior to the filing of the application. This Court should look at the Unum allegations in the context of this 59-year old professional's life in the United States, having lived here since 1973. It would be a shame if the self-serving allegations of an insurance company in terminating a high-end pay-out and which was the subject of a class-action settlement agreement of which this petitioner is a member, could cost Dr. Meyersiek his citizenship in the U.S.

Respectfully submitted,

Laura C Harrington

Laura C. Harrington, Esq.
Attorney for Petitioner
Pond, Harrington & Potts P.C.
575 East Main Rd.
Middletown, RI 02842
(401) 849-0111
(401) 847-0888 (fax)

## CERTIFICATION

I hereby certify that the above Post-hearing memorandum was forwarded to Robin Feder, Esq., Assistant U.S. Attorney, 50 Kennedy Plaza, Providence, RI 02903 by first class mail postage prepaid this 28 day of July 2006.

L Harrington

## V. Conclusion

Under the INA, the Court may look at the petitioner's history beyond the five years prior to the filing of the application. This Court should look at the Unum allegations in the context of this 59-year old professional's life in the United States, having lived here since 1973. It would be a shame if the self-serving allegations of an insurance company in terminating a high-end pay-out and which was the subject of a class-action settlement agreement of which this petitioner is a member, could cost Dr. Meyersiek his citizenship in the U.S.

Respectfully submitted,

Laura C Harrington

Laura C. Harrington, Esq.
Attorney for Petitioner
Pond, Harrington & Potts P.C.
575 East Main Rd.
Middletown, RI 02842
(401) 849-0111
(401) 847-0888 (fax)

## CERTIFICATION

I hereby certify that the above Post-hearing memorandum was forwarded to Robin Feder, Esq., Assistant U.S. Attorney, 50 Kennedy Plaza, Providence, RI 02903 by first class mail postage prepaid this 28th day of July 2006.

L Harrington