UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

GERO MEYERSIEK

v. CA 05-398 ML

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, et al.

MEMORANDUM AND DECISION

This matter is before the Court for decision on a Petition for Adjudication of Naturalization filed pursuant to 8 U.S.C. § 1447(b). The Respondents oppose the Petition, citing as grounds Petitioner's failure to establish that he "has been and still is a person of good moral character," as required by 8 U.S.C. § 1427(a). The Court conducted an evidentiary hearing at which Petitioner, his ex-wife, and his optometrist testified. In addition, the Court admitted several documentary exhibits into the record. Having considered all the evidence and the parties' written post-hearing memoranda, the Court finds that Petitioner has not met his burden of establishing that he is a person of good moral character. Accordingly, for the reasons set forth below, his Petition is DENIED.

I. Facts

Petitioner was born in Germany in 1947. He came to the United States in 1969 to attend Indiana University. He later earned a Ph.D. in Quantitative Analysis from that university. Petitioner has been a lawful permanent resident of the United States since 1975.

Petitioner worked as an executive at several companies in the United States continuously from the early 1970s until he was terminated by Textron in June of 2001. Petitioner began his work at Textron in 1995 as Vice President of Strategy and International. In that position, he was required to travel two weeks out of every month, both domestically and internationally.

Petitioner was diagnosed with retinitis pigmentosa ("RP") at the age of 19. According to Petitioner, the condition is an inherited disease that leads to the gradual deterioration of the retina, starting from the periphery and ending in total blindness. Petitioner testified that the disease affects his night vision, makes attendance at social and business events difficult, and hampers his ability to travel, particularly in airports or crowded places. Petitioner had an eye exam in January 2001, and at that time, his doctor found that his RP had progressed to the point that Petitioner was determined to be "legally blind." Petitioner testified that the diagnosis came as a "relief," because it was "getting impossible to do this work."

Petitioner's optometrist, Dr. Helene Bradley, saw Petitioner in June 2001, for a "low-vision evaluation." She found that Petitioner's vision field was reduced to less than 10 degrees in each eye. Doctor Bradley described Petitioner's diminished vision to be "like looking through a straw" where he can only see "straight ahead and everything else would be blind." She testified that Petitioner's condition would make it very difficult to be mobile without a cane, and that reading would be very difficult because he would continuallly lose his place, even with magnified print. She also stated that he would not be able to function in crowds because he would keep bumping into people.

Petitioner's ex-wife, Sophia Meyersiek, also testified about the difficulties

Petitioner has experienced as a result of his RP She stated that Petitioner was impaired as early as the 1970s, and that while Petitioner was employed at GE during the 1980s and 1990s, he would return from business trips with bruises on his forehead because he had walked into a telephone post or other such obstacles. She described the continued degeneration of Petitioner's condition throughout the 1990s, where she would have to take Petitioner by the elbow in social settings and put his dinner plate directly in front of him. She said that Petitioner drove an automobile now and then because he was "strong-headed" and insisted on driving occasionally, but that she had driven him to work regularly since the 1980s.

The Meyersieks divorced in February 2001; however, Petitioner now lives in an apartment in his ex-wife's house. Mrs. Meyersiek stated that the relationship is platonic and that she provides him with an apartment because he cannot function as a result of his vision loss.

Respondents contend that Petitioner has failed to establish that he is a person of good moral character. In particular, Respondents point to certain representations made by Petitioner to UNUM Provident Corporation ("UNUM"), the long-term disability carrier which initially found Petitioner to be disabled, but ultimately discontinued paying him long-term disability benefits.

Petitioner submitted his initial written application to UNUM on July 2, 2001. In that application, Petitioner stated that he had been unable to work because of his RP since June 4, 2001. He further indicated on the application form that he did not expect to return to either part-time or full-time employment. By signing the form, Petitioner attested that his statements were "true and complete."

Prior to filing with UNUM, on June 7, 2001, Petitioner was formally terminated for cause by Textron. On August 22, 2001, the manager of Benefit Programs for Textron completed and forwarded to UNUM the "Employer Section" portion of Petitioner's long-term disability benefits application. She listed June 7, 2001 as Petitioner's "last day worked." She included a 3-page job description for "Vice President, Strategy and International" and several pages of Petitioner's medical records.

On January 3, 2002, Petitioner was notified by UNUM that his claim for long-term disability benefits had been approved retroactive to December 5, 2001. Petitioner began collecting $15,000 per month long-term disability benefits and continued to receive those benefits until January 8, 2003. UNUM terminated Petitioner's benefits when it learned that Petitioner's employment with Textron had been terminated for misconduct and not because of his disability.

On March 13, 2002, Petitioner told a registered nurse working for UNUM that he could not travel, could not hold meetings, could not read reports or work on the computer because of his RP. On August 18, 2002, Petitioner submitted a written statement to UNUM in support of his claim for total disability in which he stated that he was "at home, no activities beyond home (almost complete blindness)." He further stated that he was "not expecting to return" to work.

Notwithstanding his representations to UNUM as to his limitations, on June 5, 2002, Petitioner sent his resume to a recruiter, along with an e-mail, wherein he stated, "[a]t this point in my life, I think that I would like to pursue a CEO/COO position at a smaller, perhaps privately held or VC company.' In the summer of 2002, Petitioner made inquiries about employment at a company in Hartford, Connecticut. And,

throughout 2002, Petitioner also talked to a number of recruiting firms to secure employment. In September 2002, Petitioner flew to Minnesota to interview for a position at 3M, and he flew to Toronto for pleasure.

## II. Discussion

An applicant for United States citizenship has the burden of establishing that he meets all the statutory requirements of naturalization. INS v. Pangilinan, 486 U.S. 875, 887 (1988). "Because the right to become an American citizen is such a precious one . . . there must be strict compliance with all the Congressionally imposed prerequisites before conferring citizenship." Plewa v. INS, 77 F. Supp. 2d 905, 909 (N.D. Ill. 1999) (citing Federonko v. United States, 449 U.S. 490, 506-07 (1981)). Any doubts as to whether the applicant has met his burden "should be resolved in favor of the United States and against the claimant." Berenyi v. District Director, INS, 385 U.S. 630, 636-37 (1967) (quoting United States v. Macintosh, 283 U.S. 605, 626 (1931)).

Respondents agree that Petitioner has met all statutory criteria for naturalization save one: the requirement that he establish his good moral character for the five years preceding the date of his application up to the present time. Petitioner submitted his application for naturalization on October 31, 2002; therefore, the operative time frame for the purposes of determining his petition for naturalization is October 31, 1997 to the present.

Section 316.10 of the Code of Federal Regulations entitled "General Requirements for Naturalization - Good Moral Character" provides in part:

> Unless the applicant establishes extenuating circumstances,

> the applicant shall be found to lack good moral character if, during the statutory period, the applicant . . . [c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts, although the acts do not fall within the purview of § 316.10(b)(1) or (2).

8 C.F.R. § 316.10(b)(3)(iii). Although the words "unlawful acts" are not further defined, the Court interprets them to mean bad acts that would rise to the level of criminality, regardless of whether a criminal prosecution was actually initiated. See United States v. Jean-Baptiste, 395 F.3d 1190, 1193 (11th Cir 2005). Respondents argue that statements made by Petitioner in support of his claim for long-term disability insurance payments were fraudulent, and, as such fall with the reach of Section 316.10(b)(3)(iii). The Court, therefore, looks closely at what Petitioner said or didn't say to UNUM for the time period before and during his receipt of long-term disability benefits.

On July 2, 2001, Petitioner submitted his application for long-term disability benefits to UNUM. In answer to the question, "[y]ou have been unable to work because of [RP] since what date?" Petitioner wrote "6/4/2001." By signing the application, Petitioner attested that "[t]he statements made by me on this claim are true and complete." At the time Petitioner submitted his claim to UNUM, he knew that he had been terminated for misconduct by Textron on June 7, 2001. He further knew that he had worked without restriction or accommodation up until that date.

In March 2002, Petitioner was interviewed by a registered nurse from UNUM. Petitioner reported to her that he could not travel, work on the computer, hold meetings, or read reports. He further conveyed to her that "because of his blindness, he can do nothing." At the time Petitioner made these statements, he knew that he had traveled

alone by plane to Germany and Florida for pleasure in February 2002.

In August 2002, Petitioner completed a "Claimant's Statement" form for UNUM. He was asked to "describe how time is occupied and outline what activities you engage in at present." Petitioner responded "at home, no activities beyond home (almost complete blindness)." In response to the question, "[w]hen do you expect to return to work?" Petitioner responded, "not expecting to return."

That form contained a warning:

> Any person who knowingly and with intent to defraud any insurance company or other person, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any material fact thereto, commits a fraudulent insurance act which is a crime.

Notwithstanding what Petitioner had told UNUM in March and August, Petitioner knew that he had been working with several recruiters and that he had held himself out as having the capabilities to do executive work in industry. In June 2002, Petitioner sent one of the recruiters an e-mail and a copy of his resume. In the e-mail, Petitioner wrote, "I would like to pursue a CEO/COO position at a smaller, perhaps privately held or VC company. I could also see a role in a higher-risk company such as a Tyco or Conseco . . . My principle value, as I perceive it, lies in my multi-functional experience that includes successful line and staff jobs."

In December 2002, Petitioner testified at a series of hearings before the Rhode Island Family Court. During the course of those proceedings, Petitioner testified under oath that:

(1) he talked to "a number" of recruiting firms during 2002;

(2) he traveled alone by plane to Germany and Florida for pleasure in February 2002;

(3) he made inquiries about employment at a company in Hartford, CT during the summer of 2002;

(4) he rode his bicycle unaided during the summer of 2002;[1]

(5) he traveled alone by plane to Minnesota to interview for a job with 3M in September 2002; and,

(6) he traveled alone by plane to Toronto for pleasure in September 2002.

Petitioner argues that the medical evidence he has submitted fully supports a determination that he was disabled and therefore entitled to long-term disability benefits from UNUM. This contention, however, misses the point of the inquiry that must be made here. The critical question for the Court is whether Petitioner made material misrepresentations to UNUM in support of his claim of total disability.

There is no question that Petitioner suffers from a debilitating medical condition. The record evidence clearly supports such a finding. The question before the Court, however, is whether Petitioner was truthful in his statements to UNUM about the limitations on his activities as a result of that medical condition. The Court finds it difficult to reconcile the discrepancy between what Petitioner reported to UNUM and the level and types of activities he engaged in during the year 2002. That significant discrepancy gives rise to an inference that Petitioner purposefully exaggerated his limitations to support his claim of "total disability " thereby inducing UNUM to act favorably on his claim for long-term disability benefits.

---

[1]At the July 13, 2006 hearing before this Court, Petitioner further admitted he had purchased a new bicycle in June 2002 and that he rode it in the summer of 2002.

A caveat is in order: where there is smoke, there is not always fire, and this Court cannot, on this record, make a conclusive finding that Petitioner intended to commit insurance fraud. It is enough, however, to find that Petitioner's actions, with all doubts resolved against him, fit within the preclusive language of 8 C.F.R. § 316.10(b)(3)(iii) (unlawful acts that adversely reflect upon the applicant's moral character). Furthermore, Petitioner has pointed to no "extenuating circumstances" that would resolve the Court's concerns. On this record, the Court is constrained to find that Petitioner has not met his burden of establishing his good moral character.

## III. Conclusion

This Court has no authority to confer citizenship unless all of the statutory requirements have been met. Pangilinan, 486 U.S. at 884-85. Having determined that Petitioner has not established the statutory prerequisite that he "has been and still is a person of good moral character," 8 U.S.C. § 1427(a), this Court finds that it must, and hereby does, deny his Petition for Naturalization.

SO ORDERED:

Mary M. Lisi

Mary M. Lisi
United States District Judge
August 17, 2006